**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0719n.06

**Case No. 11-3692**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Jul 05, 2012*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| DENNIS L. WILLIAMS, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| UNITED STEEL WORKERS OF | ) | DISTRICT OF OHIO |
| AMERICA, et al., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

**BEFORE:  BATCHELDER, Chief Judge; GRIFFIN, Circuit Judge; and COHN, District Judge.**[*]

**ALICE M. BATCHELDER, Chief Judge.**  Appellant Dennis Williams was discharged from his job as a forklift operator at Appellee Steelcraft for violating Steelcraft's zero-tolerance drug policy.  After grievance and arbitration processes failed to get his job back, Williams filed a claim under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, against Steelcraft and against his union, Appellee United Steel Workers of America AFL-CIO Local 7679 (the "Union").  Under this claim, known as a "hybrid § 301" claim, he must show both that Steelcraft violated the collective bargaining agreement ("CBA") and that the Union violated its duty to fairly represent him in efforts to get his job back.  Steelcraft and the Union moved for and received summary judgment below, from which Williams timely appealed.  Because we find that Steelcraft did not breach the CBA, we

---

[*]Honorable Avern Cohn, United States Senior District Judge for the Eastern District of Michigan, sitting by designation.

AFFIRM the district court's grant of summary judgment and do not need to address whether the Union provided fair representation.

**I.**

Under Article XIV of the CBA, Steelcraft may discharge its employees as part of its "right to establish reasonable rules and regulations governing the conduct of employees." By this authority, Steelcraft established Work Rule 5, which states that "[b]eing under the influence of . . . alcoholic beverages, drugs, or any other body altering substance during scheduled work time" will "ordinarily justif[y] discharge for the first offense[.]" While hardly a model of precision—coffee is loved and pursued precisely because it is a "body altering substance," yet consuming it is not likely a discharge-worthy offense—Williams understood that Work Rule 5 meant that being under the influence of illegal drugs led to serious consequences. Work Rule 5 and other work rules were posted by the time clock, where Williams would easily have seen them.

Steelcraft had two unwritten policies that it used to enforce Work Rule 5. The first was a zero tolerance policy: if an employee had any illegal drugs in his system, he violated the Rule. The second, which Williams admits that Steelcraft had generally enforced since the late 1980s, was a policy to require individuals to take a drug test after they were involved in an accident at work or were injured on the job.

Williams worked for thirty years as Steelcraft employee and a Union member. On May 15, 2006, Williams was driving a forklift and eating a sandwich when his supervisor informed him that he was not wearing his seatbelt. Williams then tried to put on the seatbelt while holding his

sandwich and driving. Somewhat predictably, this led to an accident: he hit a large, metal support beam with the forklift. The impact caused Williams to cut his mouth, so he went to the restroom to clean the cut. When he returned, he was told to get a drug test per Steelcraft's accident policy. Williams agrees that Steelcraft had the right to send him out for a drug test after his accident.

Because Williams might be under the influence of alcohol or drugs, Steelcraft paid for a cab to take him to Bethesda Care for the drug test. Bethesda Care obtained a urine sample from Williams and sent it to MedTox Laboratories for analysis. Steelcraft suspended Williams until the test results were returned.

Ten days later, Steelcraft learned that Williams had tested positive for marijuana and cocaine. Steelcraft immediately discharged him for violating Work Rule 5.

While Williams admits to having smoked marijuana at the Kentucky Derby ten days before the accident, he denies using cocaine. He argues that the positive result for cocaine can be explained only by exposure to secondhand cocaine smoke at the Derby, though he admits he was unaware of anyone smoking cocaine in his presence.

Williams went through the CBA's grievance process with the Union and Steelcraft in a bid to regain his job. Though each of the prior grievance steps had proved fruitless, in August 2006, the Union decided to initiate the next and final grievance step—arbitration—because it "determined that Mr. William's [sic] grievance does in fact have merit[.]" Little to nothing occurred on Williams's arbitration for the next two years.

In July 2008, an Ohio trial court reversed the Ohio Unemployment Compensation Review Commission's decision to deny Williams unemployment benefits. The trial court based its ruling on the finding that Williams had not violated Work Rule 5. It did not offer any explanation for its finding.

A few months before the trial court's ruling, in April 2008, the Union unilaterally withdrew Williams's grievance from arbitration. The Union told Williams about its action several months later, near the end of 2008. Williams then timely filed this suit.

On motions from Steelcraft and the Union, the district court found that neither Steelcraft nor the Union was liable under § 301 and granted summary judgment against Williams. On appeal, Williams makes three basic arguments why the district court was wrong as to Steelcraft. First, he argues that the district court paid insufficient heed to the state court's decision, and the testimony of Steelcraft officials supporting it, that Williams did not violate Work Rule 5. Second, he argues that the zero-tolerance-enforcement policy for Work Rule 5 is not required by the rule's language and was, at best, unevenly applied. Third, he argues that irregularities with the drug test report raise material issues of fact that must be resolved by a jury. We reject each argument.

**II.**

We review de novo the district court's grant of summary judgment. *Spees v. James Marine, Inc.*, 617 F.3d 380, 388 (6th Cir. 2010). Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* (citing Fed. R. Civ. P. 56(c)(2)). To create a dispute of fact, though, Williams may rely only on evidence that

could be admissible at trial to counter the admissible facts Steelcraft and the Union used to support their motions. *See Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). In reviewing the facts, we draw all reasonable inferences in Williams's favor. *Spees*, 617 F.3d at 388 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## III.

As noted at the outset, Williams must pass a two-part test to be successful on his hybrid § 301 claim. *See Roeder v. Am. Postal Workers Union*, 180 F.3d 733, 737 (6th Cir. 1999). First, he must show that Steelcraft violated the CBA when it discharged him. *Id.* Second, Williams must show that the Union did such a poor job representing his interests during the grievance process that it breached its duty of fair representation. *Id.* Unless he makes both showings, neither Steelcraft nor the Union is liable. *Id.* Because we find that Williams failed to make the first showing, his entire claim fails.

To determine whether Steelcraft violated the CBA, we start with the plain language of the agreement. *Roeder*, 180 F.3d at 737 (citing *Policy v. Powell Pressed Steel Co.*, 770 F.2d 609, 618 (6th Cir. 1985)). Helpfully, that is where the main thrust of Williams's claim is focused. While acknowledging, as he must, that CBA Art. XIV gave Steelcraft the authority to enact Work Rule 5, he argues that Work Rule 5's language does not make it a zero-tolerance policy. And in this, he is right. The rule does not define "under the influence." It could mean, as Steelcraft and the Union argue, that *any* influence is impermissible, or it could mean, as Williams argues, that some particular level of influence must be shown.

The rule's ambiguity on this point is resolved by considering "the practices of the shop that have developed between the parties in the day-to-day administration of the" CBA. *Int'l Bhd. of Teamsters, Local 519 v. United Parcel Service*, 335 F.3d 497, 508 (6th Cir. 2003) (internal citation and quotation marks omitted). And those practices revealed that Steelcraft has always treated Work Rule 5 as a zero-tolerance policy. That treatment was initially a point of contention with the Union, but the Union quickly acknowledged that the CBA permitted Steelcraft to adopt it. Williams formally admitted to the district court that Steelcraft's enforcement was uniform, conceding that "no Union member who tested positive for illegal drugs under the Zero Tolerance policy was ever returned to work by Steelcraft, and no arbitrator ever reinstated any Union member who was terminated for . . . testing positive for illegal drugs[.]" Thus, "under the influence" in Work Rule 5 means *any* influence, and Williams's primary argument fails.

To avoid this result, Williams argues on appeal that Steelcraft actually *did* allow an individual who tested positive for illegal drugs to return to work. This argument fails for three reasons. First, Williams cannot take back the contrary formal admission he made below. *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 829 (6th Cir. 2000). Second, the zero-tolerance gloss on Work Rule 5 meant only that any amount of drugs violated the rule, not that any violation of the rule required a discharge. The rule is clear on this point, stating that a violation will "*ordinarily* justif[y] discharge for the first offense[.]" Third, Williams's brief identifies only one individual as having tested positive and yet returned to work. But the sole information about this individual in the record is Williams's testimony about what the individual's brother told him. That

is irretrievably inadmissable hearsay, and thus cannot be used to oppose summary judgment. *Alexander*, 576 F.3d at 558 (recognizing that "[h]earsay evidence" used to counter a motion for summary judgment "must be disregarded." (internal quotation marks and citation omitted)).

In sum, Williams's core argument is hollow. And his two other arguments are even less substantial.

In the first, he argues that the district court's judgment ignores the state court's unemployment benefits ruling that Williams did not violate Work Rule 5. But, as the district court recognized, state law explicitly bans unemployment benefits cases from having any *res judicata* or collateral estoppel effect in "any separate or subsequent judicial . . . proceeding." Ohio Rev. Code § 4141.281(D)(8); *accord Murray v. Kaiser Permanente*, 52 F. App'x 725, 726 (6th Cir. 2002). Williams offers no reason to ignore state law, and we cannot see one. Williams also argues that testimony from Steelcraft officials in the state court proceedings is inconsistent with their depositions submitted to the district court. But he fails to cite a single instance where one of Steelcraft's employees testified to anything that contradicts that employee's testimony in this case. If anything, their testimony was remarkably consistent in both cases.

In his final argument, Williams posits that certain alleged "irregularities" about the drug test create "material issues of fact" about the test's reliability. For instance, he notes that the laboratory that handled the test was not approved by the Ohio Department of Health; that a nurse, instead of a doctor, signed the drug test report; and that the test does not specify how much marijuana and cocaine was found in his system. But these issues are all irrelevant to Williams's claim that

Steelcraft violated the CBA. Williams does not identify any CBA section that requires Steelcraft to use certain labs that follow certain procedures and that give a certain level of detail to their results for drug tests. We will not invent contractual obligations for Steelcraft so Williams can create factual disputes to keep his claim alive. And even if we did, a factual dispute on the drug test's reliability provides no help to Williams since he admitted to using marijuana and possibly inhaling second-hand cocaine smoke.

## IV.

On the foregoing grounds, we **AFFIRM** the district court's grant of summary judgment against Williams.