NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0159n.06

No. 16-6241

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Mar 14, 2017
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| MICHAEL WAGGONER, | ) | |
|  | ) | |
| Plaintiff-Appellant, | ) | |
|  | ) | |
| v. | ) | ON APPEAL FROM THE |
|  | ) | UNITED STATES DISTRICT |
| CARLEX GLASS AMERICA, LLC, | ) | COURT FOR THE MIDDLE |
|  | ) | DISTRICT OF TENNESSEE |
| Defendant-Appellee. | ) | |

Before: KEITH, ROGERS, and KETHLEDGE, Circuit Judges.

KETHLEDGE, Circuit Judge. Carlex fired Michael Waggoner for cause after four incidents in which Waggoner, who has bi-polar disorder, lost his temper and screamed at his co-workers. Waggoner sued Carlex for alleged violations of the Americans with Disabilities Act. The district court granted summary judgment to Carlex. We affirm.

I.

In January 2007, Waggoner began working at the Ford Glass Plant. The plant has a "hot end," where workers melt and mold glass, and a "cold end," where workers cut the glass and package it for shipment. Waggoner worked in the cold end for a month or so, and then moved to the hot end. Shortly thereafter, Zeledyne, Inc. bought the plant.

While working for Zeledyne, Waggoner was disciplined for two violent outbursts towards his co-workers. In 2009, Waggoner screamed and cursed at an engineer, Vanesia Swafford. Waggoner's supervisor sent him home for the day. In 2010, Waggoner began yelling

at another co-worker, Thomas Rucker, when Rucker asked Waggoner not to use a computer that was receiving an update. Rucker tried to walk away, but Waggoner pursued him and continued yelling at him. After this incident, Zeledyne suspended Waggoner for four to six months.

During his suspension, Waggoner informed a human-resources manager, Bill Kernahan, that he has bi-polar disorder. Kernahan advised Waggoner to seek treatment and said that Waggoner could return to work after treatment if Waggoner consented to a "last chance agreement." The agreement provided that Waggoner would be immediately discharged if he had any further outbursts.

In April 2011, Carlex acquired the glass plant from Zeledyne. As part of the acquisition, Carlex and the workers' union agreed on workplace rules that prohibited employees from "using abusive or threatening language against any other employee" or "engag[ing] in . . . acts of threat or assault." Under the union agreement, Carlex could discharge employees only for cause.

Carlex assigned Waggoner to the cold end of the facility. Waggoner's team leader, A.J. Jones, directed the work of the group and set each member's schedules. In September 2011, Waggoner bid on a night-shift furnace job in the hot end of the facility. Carlex awarded him the job, but he declined it, telling management that he wanted to remain on the day shift. At some point, Waggoner may also have mentioned that he did not want to work with Korron Gardner, a supervisor on the hot end, but Waggoner does not think that he mentioned Gardner at the time. Waggoner never worked with Gardner except when Waggoner volunteered for overtime shifts on the hot end.

In April 2013, Waggoner screamed at Jones for making a change to Waggoner's break schedule, which Waggoner felt was unfair. A few months later, Waggoner bid on another two hot-end job openings—one on the day shift and one on the night shift. During the interview

process, Waggoner told management that he did not want the night shift, which Gardner supervised, because Waggoner found Gardner's penchant for horseplay annoying. Ultimately, management awarded the open positions to other employees.

In September 2013, Waggoner confronted Jones again, accusing him of manipulating the break schedule so that Jones received more breaks than other employees. Waggoner lost his temper and began yelling at Jones, which drew the attention of a large crowd. According to Jones, Waggoner not only verbally attacked him, but also threatened and physically pursued him. During the company's investigation, Waggoner did not deny those allegations, but said that he had not been taking his medications. Later, when Waggoner was deposed, he denied threatening Jones, but admitted to using "abusive language."

In October 2013, Carlex fired Waggoner for cause, citing the work rule against using abusive language toward co-workers. Several months later, Waggoner's lawyer filed a complaint with the Equal Opportunity Employment Commission, alleging that Carlex had discriminated against Waggoner because of his disability and had failed to provide him an accommodation. Waggoner did not raise claims of retaliation or hostile work environment. After the EEOC issued Waggoner a right-to-sue letter, he sued Carlex in federal court on four ADA claims: disability discrimination, failure to provide an accommodation, retaliation, and hostile work environment. The district court granted summary judgment to Carlex, denying Waggoner's first two claims on the merits and the latter two for failure to exhaust administrative remedies. Waggoner now appeals.

II.

We review the district court's grant of summary judgment de novo. *Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017). Summary judgment is appropriate when "there is no genuine dispute as to any material fact[.]" Fed. R. Civ. P. 56(a).

A.

Waggoner first argues that Carlex discriminated against him on the basis of his disability by firing him. To establish a prima facie case of disability discrimination, Waggoner must show, among other things, that "similarly situated" non-disabled employees "were treated more favorably" than he was. *Jones v. Potter*, 488 F.3d 397, 404 (6th Cir. 2007). In the disciplinary context, employees are "similarly situated" only if they have "engaged in acts of comparable seriousness." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006). Employees are not similarly situated if there are "differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Jones*, 488 F.3d at 405.

Here, Waggoner identifies two non-disabled employees who, he says, were similarly situated to him yet received more favorable treatment. First, one of Waggoner's co-workers on the cold end, Steve Farris, showed signs of being under the influence of drugs at work. According to Waggoner, one day Farris was slumped in his chair and drooling on himself, but Farris's supervisor responded only by nudging Farris awake. A year or two later, Farris was arrested for illegal drug possession while on his lunch break in his car. As far as Waggoner knows, Farris was not disciplined or fired for that arrest. Second, Waggoner's team leader, A.J. Jones, once told an employee to "get her black ass out here." Waggoner presents no record evidence as to how Carlex responded to that incident, but his complaint alleges that Carlex sent Jones home for less than a day.

Neither of these employees was similarly situated to Waggoner, for several reasons. First, Carlex may have concluded that Waggoner's misconduct was more serious than either Farris's or Jones's. As Waggoner testified, the Carlex plant is a "dangerous workplace" with sharp glass, hot furnaces, and moving machinery. In that environment, Waggoner's outbursts may have posed a greater threat to workplace safety than Farris's lethargy or Jones's racial insensitivity. Second, neither Farris nor Jones had a history of infractions like Waggoner, who was fired after four separate incidents in which he verbally attacked or physically pursued co-workers in a fit of rage. Third, neither Farris nor Jones had signed a "last-chance agreement." And fourth, neither Farris nor Jones violated a "last-chance agreement," which Waggoner did when, in April 2013, he yelled at his team leader—an infraction that Carlex apparently chose to overlook. Waggoner's disability-discrimination claim therefore fails.

## B.

Waggoner next argues that Carlex should have accommodated his disability by transferring him to another department. An employer has no obligation to provide an accommodation, however, unless the employee requests one. *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046 (6th Cir. 1998) (citing C.F.R. § 1630.9). Waggoner contends that, though he never made a formal request for an accommodation, he told Carlex about his disability at some point and complained about certain employees. In Waggoner's view, Carlex should have realized that he was applying for the hot-end job in 2013 for medical reasons, even though he never said as much.

Generally, "it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." *Gantt*, 143 F.3d at 1046 (quoting C.F.R. § 1630.9). True, the employee need not use magic words like "accommodation" or "disability." *See Smith*

*v. Henderson*, 376 F.3d 529, 534-35 (6th Cir. 2004).  The employer is not required to speculate, however, "as to the extent of the employee's disability or the employee's need or desire for an accommodation." *Gantt*, 143 F.3d at 1046-47.  Thus, we have repeatedly held that the employee must "make it clear" both that he is making a request and that he is doing so because of his disability.  *See Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 307 (6th Cir. 2016); *accord Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 407 (6th Cir. 2014).

Here, the connection between Waggoner's request and his bipolar disorder was not clear.  When Waggoner applied for the hot-end jobs, he never so much as hinted that he was trying to avoid A.J. Jones, his team leader on the cold end.  From Carlex's perspective, Waggoner may simply have wanted the hot-end job because he "liked it" and "had trained for it," as Waggoner himself said in his deposition.  As to which of the two hot-end jobs Waggoner preferred, Waggoner did explain that he wanted to avoid Korron Gardner, the night-shift supervisor.  But Waggoner never said he was trying to avoid Gardner because Gardner might trigger his bipolar disorder.  And Carlex had good reason to think otherwise: Waggoner had regularly volunteered to work overtime under Gardner's supervision, without apparent incident.  Since Waggoner failed to give Carlex sufficient notice that he was requesting an accommodation, Carlex did not violate the ADA by failing to provide one.

## C.

That leaves Waggoner's retaliation and hostile-work-environment claims.  According to Waggoner's complaint, Carlex retaliated against him for requesting an accommodation by rejecting his proposed transfer to the hot end.  Separately, Waggoner alleges that a supervisor repeatedly harassed him at work because of his disability.  The district court dismissed these claims for failure to exhaust administrative remedies.

Before suing an employer, an ADA plaintiff must file a charge with the EEOC and receive a right-to-sue letter. *See Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 309 (6th Cir. 2000). The charge must "identify the parties and . . . describe generally the action or practices complained of." 29 C.F.R. § 1601.12(b). In federal court, the plaintiff may present only claims raised in the EEOC charge or claims "reasonably expected to grow out of the charge[.]" *Cleveland Branch, N.A.A.C.P. v. City of Parma, OH*, 263 F.3d 513 (6th Cir. 2001). "Liberal construction" of the EEOC charge is unnecessary where, as here, "the claimant is aided by counsel in preparing his charge." *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 546 (6th Cir. 1991), *abrogated on other grounds as recognized by Hill v. Nicholson*, 383 F. App'x 503, 508 (6th Cir. 2010).

Waggoner failed to raise either a retaliation claim or a hostile-work-environment claim in his EEOC charge. Thus, Waggoner cannot sue on those claims "unless the allegations in the complaint can be reasonably inferred from the facts alleged in the charge." *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 362 (6th Cir. 2010). Here, the only allegations in the charge are that Waggoner has a disability, that he requested an accommodation, that he was asked about his medication, and that he was discharged. The charge does not mention that Waggoner was rejected for a transfer—the act of retaliation he alleges in his complaint. Nor does the charge describe any harassment. Waggoner's retaliation and hostile-work-environment claims cannot be "reasonably expected" to grow out of such bare facts. *See id.* Thus, the district court correctly dismissed these claims for failure to exhaust administrative remedies.

\* \* \*

The district court's judgment is affirmed.